■ Ava, Also Known as Maximilia Cordero, Respondent-Appellant, v NYP Holdings, Inc., Doing Business as New York

Post, et al., Appellants-Respondents, et al., Defendants. [885 NYS2d 247]—

Order, Supreme Court, New York County (Walter B. Tolub, J.), entered June 26, 2008, which, to the extent appealed from, denied that portion of the motion by defendants NYP Holdings, Inc. doing business as New York Post, Dareh Gregorian, Lucy Carne, Peter Cox, and Michelle Gotthelf sued herein as Gotthielf to dismiss the first cause of action insofar as it alleges libel regarding a purported sexual fantasy, and denied plaintiff's cross motion to seal certain court records, unanimously modified, on the law, that portion of the Post defendants' motion seeking dismissal of the first cause of action premised on libel regarding a purported sexual fantasy granted, and otherwise affirmed, without costs.

In October 2007, plaintiff[1] commenced an action to recover damages against, among others, Jeffrey Epstein. In that action, plaintiff alleged that Epstein, a wealthy money manager, had sexually exploited plaintiff when she was a minor by requesting both that she perform sex acts on him and permit him to perform sex acts on her in exchange for his assistance in helping her obtain a modeling career. The complaint contains graphic allegations regarding the specific sex acts plaintiff and Epstein allegedly performed.

Several days before plaintiff commenced the action against Epstein, defendant New York Post ran a story about the allegations in the complaint. The front page of the paper contained a picture of plaintiff with the headline "Teen Model: My kinky sex with billionaire. Bombshell Lawsuit." On page seven, a picture appeared of plaintiff sitting on the lap of her friend and

---

**1.** Plaintiff was born a biological male but has been diagnosed with "gender identity disorder" and identifies herself as a female (*see generally Matter of Brian L. v Administration for Children's Servs.*, 51 AD3d 488 [2008], *lv denied* 11 NY3d 703 [2008]). In accordance with plaintiff's preference, we refer to her using feminine pronouns.

former attorney William Unroch; a picture of Epstein also appeared on that page. The article summarized the graphic allegations in the complaint, and contained statements from Epstein's attorney disparaging the lawsuit and opining that it was time-barred. The article also contained brief statements from Unroch regarding the lawsuit. Information regarding the extent of Epstein's wealth and social connections was imparted in the article, as was the status of a criminal case against him for soliciting underage prostitutes that was pending in Florida at the time the article was published.

On October 23, 2007, the New York Post published another story regarding plaintiff's lawsuit against Epstein. The article was entitled "GENDER-BEND SHOCKER, Kinky-sex suit gal is a man," and featured two pictures of plaintiff, one of Epstein and one of the front page of the prior edition of the New York Post that first reported on the *Cordero v Epstein* lawsuit. The article reads:

"The stunning model wannabe who says she was pressured into a hush-hush affair with billionaire Jeffrey Epstein when she was only 16 has an even bigger secret—she's a man.

"Maximilia Cordero, who stepped forward last week with a lawsuit claiming she'd engaged in 'bizarre and unnatural sex acts' with Epstein while in her teens, was born Maximillian Cordero in 1983, records show.

"He was dressing up as a girl by age 12, and has been living as a female since his early teens, sources close to Cordero told The Post. Cordero has had cosmetic work done and has taken hormone treatments for almost a decade to look more like a woman, one source said.

"On one of at least three MySpace pages featuring her pictures, she lists her gender as 'male.'

"She is listed as female on the other two. On one, she gives a graphic depiction of a 'masturbatory fantasy' she has of being with multiple men and then multiple women, and on the other, the 23-year-old describes herself as 'a 17 year old model from New York City.'

" 'I'm a spoiled bitch and really mean,' the page says.

" 'I love to have fun, hang out and party! Oh and I'm a junk head (pills, designer substances. . . .)'

"While her suit says she was too 'disabled as a result of severe mental disease and defect' to bring a suit against Epstein earlier than seven years after he allegedly sexually abused her, her purported MySpace page indicates she's been able to live a productive life. 'I'm currently attending F.I.T. part time (because of modeling) to earn my fashion degree,' her page says.

"Epstein's spokesman, Howard Rubenstein, called the revelations 'shocking,' and said Cordero's claims of being victimized by Epstein should not be believed.

"Epstein, 54, is expected to plead guilty in the next month and serve 18 months in jail for allegedly having sex with an underage prostitute at his Florida estate. Investigators in Palm Beach had claimed he'd had numerous liaisons with underage— and troubled—girls there. Rubenstein said that's made him an easy target 'for money-seeking lawyers and their women.'

"Epstein lawyer Gerald Lefcourt said there haven't been any allegations of his client trysting with underage boys.

" 'He's never been accused of that,' he said, calling Cordero's suit 'ridiculous.'

"Cordero's lawyer, roommate and ex-boyfriend, William Unroch, 57, denied she's a he.

"She's female, and she's always been a female. I may also be a female. I'm checking with my doctors,' he said.

"He did acknowledge that she's had problems with drugs. 'Everybody knows that,' he said. 'She's mentally unwell and on medication for her psychosis.'

"Unroch had acknowledged being in a romantic relationship with Cordero last year, when The Post did a story on a dispute they were having with one of their neighbors, but says now they're just 'friends' and he's her 'landlord.'

"When approached by a reporter last week, Cordero looked sickly and didn't want to talk about her past.

" 'I'm deeply hurt by what I went through,' she said.

"Lefcourt said he's girding for more craziness with people trying to go after his client's money.

" 'It wouldn't surprise me if the next claim was from the Loch Ness monster,' he said."[2]

Shortly after the October 23 article was published, plaintiff

---

**2.** A third article regarding the *Cordero v Epstein* action appeared in the New York Post on December 15, 2007, shortly after the action giving rise to this appeal was commenced. Entitled "Kinky suit's romp & circumstances," the article recounted the basis of plaintiff's suit against Epstein (and emotional and mental injuries that Epstein's conduct allegedly caused) and reported that Epstein was seeking dismissal of the suit on the grounds that plaintiff was not credible and that the suit was time-barred. The article reported that plaintiff had brought another, similar action against another man, an "ex-lover," claiming that he had an inappropriate sexual relationship with her when she was a minor, and that, according to Epstein's lawyer, the prior lawsuit "vaporized after Cordero's correct date of birth—revealing that she was not a minor— was brought to the attention of the court." Finally, the article stated that plaintiff had commenced a defamation action against the New York Post—the

*(n. cont'd)*

commenced this action against, among others, the New York Post, and certain staff of that publication (collectively, the Post defendants). The complaint asserts a number of causes of action, including one for libel, the only claim relevant to this appeal. Plaintiff claims that the article referred to and quoted from three MySpace pages that she did not maintain and did not place material on, and that the Post defendants knew that plaintiff did not maintain the pages and that they were "forgeries." Although plaintiff alleges that several statements in the article are defamatory, only one is relevant on appeal. Thus, plaintiff alleges that the statement that "[o]n one [of the MySpace pages], [plaintiff] gives a graphic depiction of a 'masturbatory fantasy' she has of being with multiple men and then multiple women" implied that she is "a promiscuous slut" and is libelous per se.

The Post defendants moved under CPLR 3211 (a) (7) to dismiss the causes of action asserted against them, and plaintiff cross-moved to seal the record in the action. Supreme Court granted the motion to the extent of dismissing all of the claims asserted against the Post defendants except for that aspect of the libel claim premised on the alleged implication in the article that plaintiff is "a promiscuous slut." The court denied plaintiff's cross motion to seal the record in the case, finding no reason to do so because plaintiff disclosed "the details of her life" in her court filings in her action against Epstein, and Unroch, her original attorney in the action against the Post defendants, spoke to the media about that lawsuit. The Post defendants appeal from that portion of Supreme Court's order that denied their motion to dismiss the libel claim in its entirety, and plaintiff cross appeals from that portion of the order that denied her cross motion to seal certain portions of the record in this action.

Defamation, the making of a false statement about a person that "tends to expose the p[erson] to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him [or her] in the minds of right-thinking persons, and to deprive him [or her] of their friendly intercourse in society" (*Rinaldi v Holt, Rinehart & Winston*, 42 NY2d 369, 379 [1977], *cert denied* 434 US 969 [1977]; *see Golub v Enquirer/Star Group*, 89 NY2d 1074 [1997]), can take one of two forms—slander or libel. Generally speaking, slander is defamatory matter addressed to the ear while libel is defamatory matter addressed to the eye (2 NY PJI2d 3:23, at 196 [2009]; *see* Prosser and Keeton, Torts § 112,

---

action giving rise to this appeal—and that the Post believed that the action was "without merit."

at 786 [5th ed]; Sack on Defamation § 2.3, at 2-9 [3d ed]). Libel is broken down into two discrete forms—libel per se, where the defamatory statement appears on the face of the communication, and libel per quod, where no defamatory statement is present on the face of the communication but a defamatory import arises through reference to facts extrinsic to the communication (*see* 2 NY PJI2d 3:23, at 197, 3:24, at 275; *see also Hinsdale v Orange County Publs.*, 17 NY2d 284 [1966]; *Cole Fisher Rogow, Inc. v Carl Ally, Inc.*, 29 AD2d 423, 426 [1968, Stevens, J.], *affd* 25 NY2d 943 [1969]).[3]

Plaintiff's libel cause of action is predicated on the theory that the October 23 article was libelous per se because the statement that "[o]n one [of the MySpace pages], [plaintiff] gives a graphic depiction of a 'masturbatory fantasy' she has of being with multiple men and then multiple women" implies that she is "a promiscuous slut." Obviously enough, plaintiff can only recover damages on her libel cause of action if she can establish that the article was in fact defamatory—"tend[ing] to expose [her] to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of [her] in the minds of right-thinking persons, and to deprive [her] of their friendly intercourse in society" (*Rinaldi*, 42 NY2d at 379). The Post defendants argue that the statement does not have a defamatory meaning because the statement only reported that plaintiff had a sexual *fantasy*; it did not report that plaintiff actually engaged in sexual conduct with multiple men and multiple women or otherwise acted on the fantasy. For that reason, according to the Post defendants, the statement does not imply that plaintiff is promiscuous and therefore is not actionable. Plaintiff argues that the statement suggests that she is so perverted that she publishes an on-line diary of masturbatory fantasies of group sex and therefore implies that she is promiscuous. Thus, according to plaintiff, the statement is defamatory.

On a motion to dismiss a claim for libel on the ground that the offending statement is not defamatory, the court must determine "whether the contested statements are reasonably susceptible of a defamatory connotation" (*Armstrong v Simon*

---

3. Where the defamatory statement is libelous per se the plaintiff can recover damages without pleading and proving "special harm" (2 NY PJI2d 3:23, at 197-199, 3:24, at 275-276), i.e., "the loss, usually monetary, of some gain or advantage which would have come to the plaintiff but for the defamation" (3:23, at 198). If, however, the defamatory statement is libelous per quod, the plaintiff can only recover damages if she pleads and proves such harm (3:23, at 197-199, 3:24, at 275-276). As her brief makes plain, plaintiff's theory on her libel cause of action is that the October 23 article is libelous per se.

& *Schuster*, 85 NY2d 373, 380 [1995]; *see James v Gannett Co.*, 40 NY2d 415, 419 [1976]). In determining whether the statement is reasonably susceptible of a defamatory meaning, the court must examine not only the particular words claimed by the plaintiff to be defamatory but the entire communication in which those words appeared (*James*, 40 NY2d at 419-420; *see Aronson v Wiersma*, 65 NY2d 592, 594 [1985]; *see also Cole Fisher Rogow, Inc.*, 29 AD2d at 426 [headline and item to which it is attached must be considered together]). The court must also read the alleged defamatory words against the background of their issuance, giving due consideration to the circumstances underlying the publication of the communication in which the words appeared (*James*, 40 NY2d at 420). Thus, the context in which the allegedly defamatory statement was made is critical (*see* Sack on Defamation § 2.4.2.2, at 2-22 ["Context is . . . typically determinative"]). If the words used in the communication, "tested by [their] effect upon the average reader" (*James*, 40 NY2d at 419), are not reasonably susceptible of a defamatory meaning, "they are not actionable and cannot be made so by a strained or artificial construction" (*Aronson*, 65 NY2d at 594).

A communication that states or implies that a person is promiscuous is defamatory (*James*, 40 NY2d at 419; *see Leser v Penido*, 62 AD3d 510 [2009]; *Rejent v Liberation Publs.*, 197 AD2d 240 [1994, Sullivan, J.]; *Ward v Klein*, 10 Misc 3d 648 [Sup Ct, NY County 2005, Richter, J.]). Here, however, tested by the October 23 article's effect on the average reader, the article is not reasonably susceptible of the defamatory connotation that plaintiff is promiscuous.

The October 23 article reported on an unusual lawsuit commenced by a transgender individual who sued a well-known, well-connected billionaire, claiming that the billionaire had sexually exploited her when she was a minor. The article was a follow-up piece to an article that had appeared in the Post approximately one week earlier that described plaintiff's sexually charged suit against Epstein. The initial article did not indicate or suggest that plaintiff was a transgender individual; instead, it was based on the premise that plaintiff was a biological female. The Post defendants apparently learned that plaintiff was a biological male after running the initial piece and, after learning that information, decided to run another story about the lawsuit. Thus, reading the alleged defamatory words against the background of their issuance (*James*, 40 NY2d at 420), the thrust of the October 23 article was that the young woman who commenced the lawsuit is a transgender individual who was born a biological male. The headline and subheadline of the

article—"GENDER-BEND SHOCKER, Kinky-sex suit gal is a man"—highlight that the purpose of the article was to provide an update regarding plaintiff's sexual identity (*see generally Cole Fisher Rogow, Inc.*, 29 AD2d at 426, 428).

The references to the MySpace pages merely served to highlight the ambiguity regarding the sexual identity of the person who sued the billionaire, an ambiguity that lay at the heart of the October 23 article. Thus, the article stated:

"On one of at least three MySpace pages featuring her pictures, she lists her gender as 'male.'

"She is listed as female on the other two. On one, she gives a graphic depiction of a 'masturbatory fantasy' she has of being with multiple men and then multiple women, and on the other, the 23-year-old describes herself as 'a 17 year old model from New York City.' "

The words plaintiff complains of—"On one [of the MySpace pages], [plaintiff] gives a graphic depiction of a 'masturbatory fantasy' she has of being with multiple men and then multiple women"—do no more than report that plaintiff described on an Internet page a "masturbatory fantasy" she had involving multiple men and women. Nothing in that sentence or elsewhere in the article supports the inference that plaintiff in fact was promiscuous (*see generally James*, 40 NY2d at 420-421). Additionally, the references to the MySpace pages were cabined by statements regarding plaintiff's lawsuit against Epstein and her sexual identity, further reinforcing the thrust of the article—that although the young person who had commenced the lawsuit had purported to be a woman, that person is in fact a transgender individual who was born a biological male.

At bottom, plaintiff's claim of defamation rests on the contention that the average reader reasonably would infer that someone with such a lewd fantasy also is in fact sexually promiscuous. That some readers might draw this inference does not render it reasonable. In light of the context in which the allegedly defamatory words appeared, those words, as a matter of law, are not reasonably susceptible of a defamatory connotation (*see James, supra*; *see also Morrow v Wiley*, 73 AD2d 859 [1980]).

This case must be contrasted with *Rejent v Liberation Publs.* (*supra*). In *Rejent*, a photograph of the plaintiff, a male model, was used in an advertising campaign in the Advocate, a magazine advocating homosexuality and featuring sexually oriented material. The advertising campaign promoted a book published by the publisher of the Advocate. That book, entitled "Lust—The Body Politic," was "a collection of photographs of naked, sexually aroused men engaged in explicit and auto-erotic acts"

(197 AD2d at 241). In the photograph, which appeared in at least four issues of the Advocate, the plaintiff was "on a leopard skin couch, bare from the waist up, cigarette dangling from his lips, hair tousled, holding his crotch area with both hands, one atop the other" (*id.* at 242). The advertisement stated:

"A PHOTO SHOWCASE FROM THE EDITORS OF THE ADVOCATE

"Lust is swirling and seething, lithe and languid, omnipresent and omnipotent.

"Lust in the 90's—tough, humorous, unrelenting and romantic.

"LUST—THE BODY POLITIC is 128 pages of the most exquisite color and black-and-white photographs from the world's hottest and newest photographers with an introduction by one of America's most controversial authors, Dennis Cooper. Flawlessly printed on 11 X 15 heavyweight paper, LUST—THE BODY POLITIC is the perfect gift. Order now to guarantee delivery for yourself, for a friend. LUST—when a body is much more than a work of art" (*id.* [brackets omitted]).

The plaintiff commenced an action against the publisher, alleging, among other things, that the advertisement implied that he was sexually lustful and promiscuous, and was therefore defamatory. The publisher moved to dismiss the defamation claim on the ground that the advertisement was not susceptible of the defamatory meaning the plaintiff ascribed to it. Supreme Court denied the motion and we affirmed.

Writing for the majority, Justice Sullivan stated that

"[t]he allegations of the complaint are . . . sufficient to state a cause of action for defamation based on the publication of plaintiff's picture in a sexually suggestive manner allegedly falsely implying that he is sexually lustful and promiscuous, that he advertises erotic photographs and that he endorses and subscribes to the sexual attitudes and views expressed in [the publisher]'s publications. The sexual overtones of his photograph are underscored by the text of the advertisement, which, in part, states, 'Lust is swirling and seething, lithe and languid, omnipresent and omnipotent' and 'LUST—when a body is much more than a work of art.'

"In this context, the word lust carries a negative overtone of sexual promiscuity. Given the strong implication of the language used, the suggestive nature of plaintiff's picture and the obviously provocative collection of photographs his picture was exploited to advertise, [the publisher]'s advertisement is reasonably susceptible of the defamatory connotation that plaintiff is

lustful and sexually promiscuous" (*id.* at 243 [footnote omitted]).

Justice Sullivan also stressed that the advertisement had to be considered in the context of the entire edition of the magazine in which it appeared (*id.*). Thus, he observed that "plaintiff's picture was surrounded by innumerable other suggestive advertisements of live sex videos, telephone sex talk, erotic devices and sexual literature. Several of the advertisements depict naked men with unzipped pants grasping their genitals and often contain provocative language . . . The context in which plaintiff's picture appears in The Advocate, in the midst of these other advertisements, only heightens the allegedly false and defamatory impression that plaintiff is sexually lustful and promiscuous" (*id.* at 243-244).

Unlike the defamatory material in *Rejent*, which appeared in a publication that featured sexually oriented material, the October 23 article appeared in a daily newspaper. The defamatory material in *Rejent*, i.e., the advertisement, included a picture of the plaintiff in a sexually provocative pose, and the magazine in which the advertisement appeared contained numerous other sexually provocative pictures and advertisements. The allegedly defamatory statement in the October 23 article, however, was not accompanied by any sexually suggestive photographs of plaintiff and there is no suggestion that material elsewhere in that day's edition of the Post contained any sexually suggestive material. Moreover, the defamatory material in *Rejent* was an advertisement that was itself sexually suggestive and promoted a product that was sexually provocative. Here, the allegedly defamatory material was part of a newspaper article providing a follow-up report to a prior article discussing an unusual lawsuit.

Finally, the court providently exercised its discretion in refusing to seal those portions of the record containing certain of plaintiff's medical records. Plaintiff failed to demonstrate that "good cause" exists to seal the record (*see* 22 NYCRR 216.1). Notably, plaintiff herself made her medical records public by filing them in court in her action against Epstein without requesting that they be filed under seal. Concur—Gonzalez, P.J., Tom, Friedman, McGuire and Acosta, JJ. [*See* 20 Misc 3d 1108(A), 2008 NY Slip Op 51281(U).]